1210819WC, Tile Roofs, Inc, Appellant by Stephen Wolfe v. Illinois Workers' Compensation Comm'n, Stephen Quilizza, Appellee by Brenton Schmitz. Counsel Wolfe, you may proceed. Thank you. Good morning. May it please the Court, my name is Steve Wolfe and I represent the Appellant, Tile Roofs. As the Court knows, there are two issues that we raise in our brief. The first one is that this matter should be reversed as a matter of law based upon the Commission's and the Circuit Court's failure to apply the proper standard to its analysis. I'm going to deal with this issue very briefly and simply say that when the Supreme Court issued its decision in Roberson, it utilized the analysis that we're advocating that the Commission and the Circuit Court should have utilized in this case. Counsel, in his response brief, suggested the Supreme Court's analysis was aspirational or dicta and it's not mandatory. It was simply a guideline that courts could use to analyze this issue. This Court utilized the Roberson analysis in Alexei last year and I don't know what was going on inside the justices' heads when they analyzed it, whether they felt that they were simply following a recommendation or an advisory by the Supreme Court to use this analysis or whether it was required. I will simply make the point that this is a common law system. We follow the Appellate Courts and the Supreme Court's decision. When the Supreme Court rules on an issue and says this is the way that we suggest you analyze these issues, I maintain that litigants and trial courts and the Commission and the Appellate Courts are duty-bound to follow that analysis. The justices on the court, obviously, I don't know what was going through your head when you decided Alexei, but I'm going to guess or presume that you felt that this was the analysis that was required after the Supreme Court issued its decision in Roberson. For those reasons, we asked the court to reverse this case based upon the fact that the proper analysis was not utilized, the proper factors were not individually analyzed, and therefore the decision cannot stand. Mr. Wolf, let me ask you to clarify. Is it your position that the Commission here did not apply any of the appropriate factors? Is that your position? Well, it may have applied some of them in a roundabout way, but it certainly didn't go through the detailed analysis as set forth by our Supreme Court in Roberson. And that's what I'm suggesting, is we know from a multitude of decisions, National T for return to work, that there are standards set down and the courts follow them, and that wasn't done in this case. May they have incidentally touched on some of those factors? May they have impliedly mentioned them? Yes, but that wasn't the analysis set down in Roberson. Well, if they've, counsel, if the court has implied or touched upon some of the factors, you're aware there's authority that states that we're to consider the Commission to have done the appropriate analysis, and maybe just a failing of memorializing their findings. I suppose in a proper case, the court could do that. But I think it's clear here that they did not follow Roberson. They did not go through the analysis. It's very easy to say, here are the six factors we're to consider, and we'll go through each of them. They didn't. They didn't follow Roberson in any way. Might they have incidentally touched on some of these factors? Yes, but they clearly didn't touch upon all of them, and they clearly did not analyze them as the court in Roberson suggested, and I believe requires that we do. Are you suggesting that if one factor is not addressed by the court, that's enough to overturn its decision? Well, it's not just one factor. There are multiple factors. No, no, I understand, but for sure, several of the factors were touched upon. In an implied roundabout way, I would concede that, but I'm talking about a standard that I believe was set forth by the Supreme Court that this court followed in Alexie, and the commission clearly did not. So, Mr. Wolf, not to further complicate the matters, but Amy, I think you're arguing a legitimate point, but there's also the body of law that says, I'm sure, we're aware of it, that ultimately we review the result that the commission arrived at, not necessarily their analysis. So, how does your argument square with that? Well, I think we're almost kind of impliedly moving into the second part of our argument, which is based upon the fact that the decision was against the manifest way to the evidence, but I think they are two separate and distinct arguments. If the commission doesn't use the proper analysis, and this court is going to determine that they came up with the right decision, I think you're stepping out of the Roberson case. You're not following the analysis, and you're trying to see whether the right result was achieved. Now, the court can do whatever it wants, but I suggest that the two items are distinct and separate. One is, did the court follow the appropriate analysis? And I think this court, regardless of what the ultimate decision of the court is, should make a clear statement that this analysis should be followed. I don't think it's advisory or aspirational, or I don't think it's dicta. I think it's something that the Supreme Court has set forth and that should be followed, and I don't think the court should countenance the commission not following the analysis set forth by the Supreme Court. I think you're making a legitimate point, but if we end up getting over the hurdle that the commission didn't consider all the factors properly, tell us why the decision, then, if we believe that they did, is against the manifest way to the evidence. Fine. I'll move to the second part of my analysis. What I'm not going to do here, your honors, is I'm not going to go through each factor. We did that in detail in our brief, and I don't really see it serving any purpose for me repeating the arguments that we made in our brief, but I do want to make some general points that I think are important. First of all, the statement of the petitioner, of the claimant that was taken before the trial speaks volumes. It speaks volumes in two ways. Number one, it is filled with admissions, and we cite many of those admissions in our brief, and again, I'm not going to go through and read those to you. They're on the paper in front of you. Those are clearly admissions that should control this matter. Secondly, he was repeatedly, petitioner was repeatedly impeached by his testimony at trial based upon what was contained in the statement. Therefore, petitioner has zero credibility, none. So where there's a dispute between what he said at trial and what he said in his statement, clearly, the statement should control for two reasons. One, the statement contains admissions, and two, he is impeached by changing his testimony at trial, therefore, has no credibility. So I think that's one important consideration. Now, I'm very aware that credibility is a fact determination, but our position is that the commission got it wrong, and the commission's decision giving the admissions and giving the multiple impeachments is clearly against the manifest way of the evidence. Another point that I'd like to point out is this is not a situation that we've seen in other cases where an employer is trying to haul somebody an independent contractor when he clearly is not. This is a situation where the petitioner, even though the respondent suggested that he form a corporation, the petitioner did the paperwork. He legally formed the corporation. He registered it with the Illinois Secretary of State. It is listed on the Secretary of State's website. He submitted a W-9 form. He applied for an employee identification number with the federal government. He had invoices printed up which he clearly, he did this, not my client. He did this. He did all of this for the reasons he stated in his statement, and that was to save on taxes, to be able to write off some of the tools that he purchased, to write off his travel. He did this as not only a tax advantage, but he wanted to be able to control this work environment. Now, in the response brief, the petitioner argues, petitioner's counsel argues that numerous things took place before the corporation was formed, but after he went to work for Tile Roofs. One in particular was the training he received on zinc roofs. That occurred before Quantum Edge was formed, and the analysis in this case must be conducted based upon after the formation of Quantum Edge, the corporation, because that's the argument in this case. The argument is, regardless of what took place prior to December of 2016, once that corporation was formed and the business was operated as a corporation, petitioner was clearly an independent contractor, and not just because of the formation of Quantum Edge, because of the way he conducted his business. How do you respond to the commission's finding that the corporate formality existed on paper only, nothing really changed? It didn't exist on paper only. It did change. First of all, petitioner was formally employed by Morgenstern, not Tile Roofs. He retired. He says himself he became a consultant, and he gives a reason for why he became a consultant. He had special expertise, special knowledge that no one else had. It's very common in this corporate world, especially in this country, where a long-time employee will retire and then go back to work as a consultant for the corporation because the corporation recognizes that this employee has special knowledge that other employees don't have based upon the knowledge that he's obtained over the years. He comes back and works as a consultant because of that special and unique knowledge. That's exactly what happened here. He decided what time to go into work. He decided what to do at work. He laid out these roofs. He didn't do the work and work side by side with employees like he did when he was employed at a different corporation, Morgenstern. It's not just on paper only. It's in fact what he was. By his own admission in the recorded statement and by his acts, this is not just him saying, yeah, I was a subcontractor. This is his acts, his forming the corporation, submitting invoices that's not based upon any specific hourly rate, submitting reimbursement for expenses, using his own tools, purchasing his own tools, taking tax deductions for purchasing tools and travel. The type of his work that his duties, his work duties and his hours change at all? Of course his hours change. He decided when to work. He decided when he could reject the job. That's not an employee. He could say, I don't want to do that job. He did. He could do that, but did he do that? Well, yeah, there's testimony in the record. I don't think we cited in our brief. There's testimony in the record where he said that he was working on a rental home of his and decided that he wanted to finish it. So he stopped taking jobs for a while because he wanted to finish this work on a rental home. He didn't take, he didn't take all the jobs he wanted. He didn't go to work when he wanted to. He went to work on his terms, on his schedule and did not, you know, work of the rank and file. Not what he did when he worked for Morgenstein. He laid out jobs because of the special expertise that he had. He was hired because of his unique expertise. Was his only client, his former employer? Well, again, his former employer was Morgenstein. He was employed at this time by Tile Roofs. Now it's true that Tile Roofs was owned by Mike Lucas and Morgenstein was owned by his wife. So there's some commonality of ownership in terms of the marital relationship, but nonetheless, they were two distinct corporations owned by two different people. So of course the work was different. He was working. What about the car? Was there something, he was provided a car when he was... He was provided a company vehicle. And there was testimony by Mike Lucas that he's not the only independent contractor that was provided with such a vehicle. Most of the people that had company vehicles were employees, but one other individual, in addition to the claimant, had a Tile Roofs vehicle that was an independent contractor. So that should not be dispositive. So did the claimant have any other clients other than that's related? Yes, he worked for another company owned by Mike Lucas's son in Wisconsin. He did some work for them, but more importantly, he testified and he said this in his statement and then acknowledged it on cross-examination that he was trying to expand his business. He was trying to get other clients. So the fact that he had not done that yet, I don't think should be a consideration because it was his intent to expand his client base. Who furnished most of the claimant's tools after the corporation was created? He purchased his own tools. He testified to that after he was impeached. He initially said that the tools were provided by Tile Roofs, but in his statement, he said he purchased his own tools and he was impeached on that testimony on cross-examination. So he purchased most of the tools and he said in his statement and reaffirmed this at trial that he did that so he could write off the expense of his travel and hotel rooms. Who provided the trading claimant needed for the zinc roofing project? That was provided prior to the formation of the corporation, but yes, that was provided by Tile Roofs. But again, I don't think that should be a fact that should be considered because at that point, the corporation had not yet been formed. That was done in early 2016 and the corporation was formed in December of 2016. So whatever happened before the formation of the the actual work, the zinc roof work was the type of work being done at the time of the injury, was it not? That's correct. But he had developed this special expertise before the formation of the corporation, before he began working for Tile Roofs in a form of a corporate entity. And that's really the question. What happened before December of 2016, before the corporation was formed, isn't at issue here. If this accident had happened before the formation of Tile Roofs, we wouldn't be here. It happened after the formation, after he started submitting invoices on Tile Roofs paper, after he started billing through Tile Roofs and taking tax deductions and working as an independent contractor. I think that's clear. And the fact that the petitioner tried to or did testify in conclusory fashion to the contrary, he was repeatedly impeached on it and it was contrary to the admissions contained in his statement. So I think the evidence is overwhelming that the petitioner clearly was acting as an independent contractor. Now, my opinion doesn't matter, obviously, but I think when you look at the actual facts, not conclusory testimony by the petitioner that's inconsistent with his statement, but when you look at the facts after December of 2016, once he started operating his legitimate corporation that was registered with the state of Illinois, for which he had an employer identification number, for which he submitted a W-9, for which he submitted invoices, and when he decided what time to go to work and what jobs to take, the overwhelming evidence is that he was working as a subcontractor at the time of this accident. And unless there are any other questions, I have no further arguments. No other questions from the court? Okay, good. You'll have time in reply. Council. Thank you. Council Schmitz, you may respond. Thank you, Justice Holdredge. Good morning, and may it please the court, Mr. Wolfe. First, I must compliment Mr. Wolfe on the timing in his argument. It was absolutely perfectly timed with the red line. So well done, sir. I want to start with Mr. Wolfe's initial arguments about the Roberson factors. The case that the employer cites to here is the Oleksii case. Oleksii is a decision of this panel that was issued shortly after the amendments to Rule 23. So I just want to note, Oleksii is citable persuasive authority, but Oleksii itself is not mandatory authority. In Oleksii and in Roberson, you know, the court discusses the analysis. Roberson itself was based on a previous set of cases, one of which included the Ware case. The Ware case quite specifically tells us there is no rigid rule of law as to whether someone is an employee or an independent contractor. It's a balancing of factors. Roberson itself does not set out a mandatory test. Roberson says in the decision says it lays out, quote, various factors that help determine whether a person is an employee, end quote. That doesn't sound like a command from the Supreme Court. That sounds like the Supreme Court saying, here are some things that are helpful. Here are some things that can be considered. As we know from the case law, and also the Luby case, none of the single factors elucidated in Roberson are determinative, and the significance of those factors changes depending on the work involved. I think that's absolutely correct, but let me ask this, counsel. Did the commission apply the Roberson factors at all? The commission applied many of the Roberson factors. The commission did not apply all of the Roberson factors. I would say that some of the Roberson factors that were talked about were sort of inapplicable to this case, and I'm going to talk about that a little bit more when we sort of get to the manifest weight argument. We also talk about Roberson, we talk about the nature of the business test. This is one of those that the commission did not talk about. The commission did not discuss the nature of the business test. I think part of the reason the commission did not discuss the nature of the business test is because on this factual pattern, it's obvious. The business that the employer is engaged in is roofing. Petitioner is engaged in roofing activities. So that's one of those that I think was just so, you know, obvious on its face. The commission chose not to specifically discuss that in its opinion. Going forward more specifically to the manifest weight argument, the employer begins by arguing there was no evidence from Mr. Kwaliza that he was forced to undergo a physical, submit to a background check, attend safety meetings, or abide by policies. And that's true. That evidence is not contained in the record. There's also no evidence in the record that petitioner had to do any of those things when he was undisputably an employee before he retired. Though one of the points there, undergoing training is something we talked about just now. Petitioner did undergo specific training in the use in the use and application of zinc roofing. That training was paid for by Tile Roofs. That training was done before the formation of Quantum Edge LLC, but it was also done after petitioner quote unquote retired and began being paid personally on a 1099 as opposed to a W2. So the change in employment relationship had already occurred at that point. Petitioner was being paid as a 1099. Personally, he would not form Quantum Edge LLC until he was quite honestly forced to by Mike Lucas. The testimony from Mr. Kwaliza indicates that Mr. Lucas withheld his pay and said, look, I'm not going to pay you anymore. I've been paying you personally. I'm not going to pay you anymore until you form an LLC for us to pay. And so the petitioner testified that he went in and did that after the fact. And then he received back pay and then received pay going forward for the work that he was doing. So Schmitz, let me ask you this. The commission found that the claimant was a de facto quote unquote employee and the corporate formality existed on paper only. Commission in essence found that the substance of the claimant's relationship to the respondent in Mortenson never actually changed. So what remained the same? What can you tell us that remained the same before and after the corporate formation occurred? Prior to the corporate formation and prior to petitioner taking his quote unquote retirement, he worked as a site supervisor for the employer. His job was to manage other employees, to make sure the roofing was being done, do layout, do the work himself. He had a corporate vehicle that he used. He had the power to order materials, to invoice materials directly to the company. Those would be paid. His hotels would be paid for by the company. None of those things changed. None of those things were different either after petitioner took his retirement or after the formation of Quantum Edge LLC. The nature of what he was doing and his relationship to Mr. and Mrs. Lucas did not change. He was doing the same things. And one of the things that we can actually see this in the petitioner's journal entries. In those journal entries, you can see the claimant records on a regular basis, the work he's doing, the weather conditions, his own hours, and the hours of other employees of Tile, Roofs, and Mortenson's that he was managing. Those don't change. We can see those throughout. We can see those in those entries that were submitted into evidence. He's still doing the exact same things that he was doing before the change in the corporate- to provide him with a car, correct? They continue to provide him with a car and pay for the gas, absolutely. And as Mr. Wolf pointed out in his argument, there was one other individual that Mike Lucas testified was an independent contractor who also had a vehicle. That individual was identified as the son of Mr. and Mrs. Lucas. So I'm not entirely sure that that's a fair analogy given that individual's special relationship to the Lucas family being a member of it. I don't think that's a fair analogy or a fair comparison. One of the other things that we talked about here is we talked about the Alexie case. And as the employer points out in their brief, the Alexie case contains, and quoting from the brief, an abundance of facts with respect to control, with respect to the control that the employer has over the employee. Alexie doesn't really have a whole lot of abundant facts about control. The only real facts about control are that in the Alexie case, the employer was on-site directing the work to be done. And that's not the case here. In the case at Barr, Mr. Kuliza was the site supervisor. He was the guy in charge for the jobs that he was doing, both before and after the case. So if we're looking at control, I think what we need to look at is the totality of those circumstances and how they all add up. The right to control can't be looked at as a vacuum. It should be looked at in relationship to how the employer is exercising that same control over other individuals who are identified to be employees. And Mr. Kuliza is doing the exact same things that you would expect an employee site supervisor to be doing. He's managing other employees. He's making sure they're doing the right things. Now, Mike Lucas was called as a witness and testified in this case. If Mike Lucas had testified, yeah, the other site supervisors, I like to go out once a day and manage them, make sure they know what they're doing. But I don't do that with Mr. Kuliza because he's an independent contractor and he's in charge of his own work site. If that testimony was in the record, that would be incredibly significant. And I think we would have more weight toward Mr. Wolf's argument. That testimony is not in the record. Justice Hudson, you asked during the argument about control over work hours. Yes, Mr. Kuliza had some control over his work hours. You can see in those journals and in his testimony, he's got some control over whether or not they're going to work on a particular day. If the weather is bad, he had the authority to call off and say, hey, guys, there's a kind of authority that a site supervisor has. It's not the authority that an independent contractor would have over employees of this corporation. Well, what was the purpose of the LLC? The purpose of the LLC, as the claimant testified, was he had to, is that he was told that he had to form an LLC, that Mr. Lucas told him, we've been paying you personally since you took your retirement. I don't want to keep paying you under your social security number. I want a tax ID number to pay because it's going to be better for me for tax purposes. And pay was withheld from Mr. Kuliza until he acquiesced, until he formed QuantumEdge LLC. And so he formed it. Now, there is evidence in the record and Mr. Kuliza stated in that recorded statement as discussed that QuantumEdge LLC was potentially going to be expanding, was going to be potentially performing work for some other companies, but it never happened. It never occurred. Well, when you form an LLC, there has to be a statement of purpose, independent of a testimony. What's that? Do you know what the statement of purpose of the LLC was? I do not. And I do not believe that that evidence is in the record. So I don't know that we have an answer to that based on the facts in the record as to what Mr. Kuliza may or may not have done. Will the record support that the purpose of the LLC was consulting? Certainly, Mr. Kuliza stated in the recorded statement that was done, he said a lot of what he was doing was consulting. But he also said in that same statement that he was employed by Tile Roofs. So there's evidence going both ways on that. There's evidence going both ways in just about every question and in just about every factor that the commission looked at and the court is being asked to look at here today. And that ultimately comes to what a lot of these cases always come to is that manifest weight standard. No rational trier of fact could come to the conclusion the commission did. That's the standard here. When I talk to my clients, when I talk to petitioners about that standard, if we're considering a review to the circuit or appellate court, the way I phrase it to them is I say, look, our burden on review is not to show that the commission was crazy, that the commission was insane. Is that in a case law somewhere? You actually have cases that say that? The case law, the quotation from the case law is that no rational trier of fact could reach the conclusion that the commission did. Or perhaps more commonly put, to overturn the commission's decision, we would have to find that an opposite conclusion to the one drawn by the commission is clearly apparent. Clearly apparent. We don't need to crazy or insane or whatever. No, I suppose that is fair, Mr. Justice. That is just sort of how I explain it to my own clients. So this is not a clear-cut case. There's competing evidence on both sides. The commission engaged with that evidence and the commission ultimately said, look, we're going to look at this and we're going to say we know there was a period where he was an employee and then we have this period that is in dispute and we're not sure. So what we're going to look at and what the commission focused on was what changed? What was the difference in the relationship? What was the difference in how the parties were interacting? What was the difference in how they were engaging with each other? And the commission ultimately found that there was no material difference in how the parties were engaging with each other. So that's ultimately why the commission ruled the way they did, as stated in their majority decision. And, of course, as we said, there is evidence on both sides. We can see from the record that the original trial arbitrator went the other way and he ruled against the petitioner and the commission reversed that finding. And, of course, the decision that's being reviewed here today is the decision of the commission, not the decision of the arbitrator and not the decision of the circuit court. So with that, unless there are any other questions, I think we've adequately addressed the issues in this case. I sort of have maybe less of a question and not attempting to be overly critical, but I believe Justice Hudson brings up a good issue, and that is that in deference to other bar members in good standing, you might want to address your clients differently when using that example. Use different words. Absolutely. I will take that under advisement, Justice Kavanaugh. Justice Hudson, thank you for that. Just in case they read the decision, they're going to say, hey, wait a minute, they didn't apply the standard that you said. Well, justices, it may be just in the interest of civility and respect to fellow lawyers. Certainly. Any other questions or comments or statements or statements? Hearing none. Thank you, Council Schmitz. Council Wolf, you may reply. Oh, you're still on mute. There we go. Okay. Sorry about that. Thank you. A couple of things. What is clearly apparent in this case is that things were not the same before when he was, when the petitioner was working for Quantum Edge. It is clearly apparent that he formed the corporation. Now, Mr. Schmitz, who I had great admiration and respect for as a person and an attorney, and I don't mean that to sound patronizing, but he made the argument that his client was forced to create this corporation and do business as a corporation. Nope. Nobody forced him to do anything. Yes. Did my client say he wanted him to work as a corporation? Yes. Mr. Qualiza could have said, no, I don't want to do that. He chose to do it. He chose to enter into this relationship, and then he, not my client, went out, created a corporation, had it registered with the state, got her federal employer identification number, printed out invoices, billed with invoices, submitted a W-9. That is different from what the relationship was with a different employer, Morganston, prior to December of 2016. Not to nitpick or anything, but didn't your client withhold payment that was due to the claimant for over 10 weeks until he had formed that LLC? I don't recall that testimony. I'm not going to contradict Mr. Schmitz because I don't recall that testimony, so I won't concede that that's true. I don't have a clear recollection of whether that's in the record or not, but let's assume for the moment that it is. My client wanted him to start the corporation. There's no question about that. The petitioner did. The petitioner did start his corporation. My point in my original argument, which I think merits repeating, is we have what we have as of the formation of the corporation. Why the corporation was formed, what happened before the corporation was formed is not relevant. The corporation was formed by the petitioner and petitioner was working under that corporation at the time of his accident. That is what's the critical. I think what might be relevant to that timeline is that if he had been working without the formation of the LLC and had been working prior to that formation and was owed 10 weeks of payment as we have to assume as an employee in order for him to get paid for work as an employee, he was somewhat coerced, if not forced. I guess there were other ways to get that payment that was owed him, a lawsuit or whatever, but in the furtherance of their business relationship, he chose to do the LLC to get paid for 10 weeks of work as an employee prior to the LLC being formed. I know you haven't conceded that the 10 weeks was owed to him at this point, but assuming that it was, that would make that timeline a bit more relevant. I respectfully disagree, only because he clearly had avenues to get paid if he thought that he wasn't being paid for work performed. I don't think that adds much to the analysis because, again, we're assuming if this is true that my client refused to pay him until he opened the corporation, there are many avenues. He could have said, look, I'm not going to do it, I'm not going to continue working with me, just pay what I'm owed, and we have to presume it would have been paid, and if not, as you mentioned, there were other avenues to recover that money. That may be salient for other issues, but the crucial issue is here at the time of the accident, what was the form of business? Whether he was coerced into it or not, he chose to do it. Nobody had a gun to his head. He wanted to continue this relationship. He wanted to continue to work. He opened the corporation, so the reasons for doing so I don't think should be controlling of the nature of the relationship at the time it existed. A couple other comments I just wanted to mention. Counsel mentioned that we continue to pay his expenses. That's not true. We didn't pay his expenses. He paid his expenses, and then he billed us for the expenses that he incurred. That is a subtle difference, but an important one, as opposed to us paying his hotel room, us paying for other expenses they incurred. These are expenses that he paid for and then submitted on his invoice for reimbursement, which is very common for independent contractors. That's exactly what happened, so that relationship did change. He testified repeatedly in his statement and at trial that he was a consultant. He opened the corporation because he wanted to have tax benefits. He didn't say, I was coerced into this and had no choice and didn't want to do it. He didn't say that. If you read his statement, it's clear that he did this voluntarily because there were tax advantages and could write off his tools that he purchased, his travel, his hotel rooms, etc. He was working alone at the time of the accident, and while he may not have always worked alone, he testified. He was originally impeached and admitted through a reference to his statement that he no longer worked alongside the employees. He would lay out the work because that was his expertise, and then the employees would do the work. When he previously worked for Morganston, he worked right alongside with his employees and worked with them after he laid the work out. Now, he was only... Mr. Wolf, I've let you go past the red light here. Okay. Well, thank you. That's all the comments I have. If there are any questions, I'll be happy to answer them, but thank you for your attention time today. I don't believe there are. Well, anyway, thank you, counsel, both for your arguments in this matter this morning.